# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| BLACK CARD LLC D/B/A LUXURY CARD, <br><br> Plaintiff, <br><br> vs. <br><br> VISA INC., VISA U.S.A., INC., JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., CHASE BANK USA, N.A., CAPITAL ONE FINANCIAL CORPORATION, CAPITAL ONE BANK (USA), N.A., <br><br> Defendants. | Case No: 17-cv-960 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## I.    INTRODUCTION

1.      This is a classic antitrust conspiracy case.  In 2007, Plaintiff Black Card LLC (Black Card) designed the "Black Card": a revolutionary credit card that would provide exceptional rewards to consumers with outstanding credit.  Visa, U.S.A., Inc. and Visa Inc. (collectively Visa) and several banks realized that the Black Card would open up a hugely significant and previously underserved market—what is now known as the affluent credit card market.  Rather than investing in Plaintiff's business or competing with Plaintiff on fair terms, however, Visa and some of its largest member banks—JPMorgan Chase & Co, JPMorgan Chase Bank, N.A., and Chase Bank USA, N.A. (collectively, JPMorgan) and Capital One Financial Corporation and Capital One Bank (USA), N. A. (collectively, Capital One)—decided to band together to hobble Plaintiff's business so they could keep the affluent credit card market, and its outsized profits, for themselves.

2.      Visa, JPMorgan, and Capital One all pretended at various points in the conspiracy to be partners with Plaintiff in bringing its revolutionary product to consumers.  Instead of being true partners, working to grow Plaintiff's business, each of these companies instead used their partnerships or prospective partnerships with Plaintiff to surreptitiously learn the secrets of Plaintiff's success, exercise control over Plaintiff's launch schedule and marketing efforts, and distract Plaintiff—with wasteful litigation, sham negotiations, and onerous and pointless marketing rules—from its primary goal of serving its customers.

3.      Upon information and belief, Visa orchestrated a series of payments to JPMorgan and Capital One, and possibly others, to facilitate the scheme.  To help JPMorgan's Chase Sapphire card launch quickly—and at an anticompetitive advantage—against the Black Card, Visa paid JPMorgan at least $200 million, disguised as "marketing incentives."  And to prevent Capital One from acquiring Plaintiff and putting its considerable heft behind the Black Card brand, Visa paid Capital One at least $150 million to invest in the Capital One Venture Card.

4.      In addition to these one-time payments, Visa funneled hundreds of millions of dollars a year to the other Defendants through its ongoing marketing agreements, which provided lucrative payments calculated as a percentage of the amount each Defendant's cardholders spent on the Visa network, payments for year-over-year growth, and additional marketing payments.

5.      Visa also made sure it had a marketing agreement with Plaintiff.  Although Visa told Plaintiff that the terms of the agreement were standard for the industry and would encourage Plaintiff's growth, those statements were very misleading.  Visa paid Plaintiff approximately $120,000 a year, while it was paying JPMorgan and Capital One hundreds of millions.  Unlike the JPMorgan and Capital One agreements, though, Visa's marketing agreement with Plaintiff was not actually about promoting Plaintiff's product.  It was about control.  Visa attempted to

2

use its marketing agreement to gain control over the valuable "Black Card" trademark and ensure that, if Visa could not use it, no one could.  In addition, Visa used the agreement to enforce onerous, *ad hoc*, and arbitrary marketing guidelines that hampered Plaintiff's efforts to get information to prospective customers and interfered with the scheduled launch of several Black Card products.

6.      The purpose of the agreements between Visa, JPMorgan, and Capital One on the one hand, and between Visa and Plaintiff on the other, was not to foster competition, but to allow JPMorgan, Capital One, and potentially other big banks and Visa partners to control the affluent credit card market and ensure that it did not become truly competitive, so that the lion's share of the outsized market profits would continue to flow to them.

7.      Visa wanted JPMorgan and Capital One as the leaders in the affluent credit card market, instead of Plaintiff, because JPMorgan and Capital One were long-time partners of Visa and could be counted on to serve Visa's interests.  Plaintiff, on the other hand, was an independent and a maverick, and thus a threat to Visa's entire way of doing business.

8.      Visa and the other Defendants sought to protect themselves at the expense of consumers: At least before their scheme unraveled, JPMorgan and Capital One, provided lower quality benefits to card users than Plaintiff.  By offering inferior benefits to consumers, the Defendants could profit more, so long as they could avoid the development of true competition in the market.

9.      The Defendants' conduct eventually forced Plaintiff to move its product to the MasterCard network to ensure its survival.  This move was highly disruptive to Plaintiff's business, but was absolutely necessary to escape the Defendants' scheme.

2307696.1

10.     The Defendants' scheme began to unravel when Visa's CEO, Charles Scharf, suddenly resigned from Visa at a board meeting in October 2016.  In a highly unusual move, Alfred Kelly (formerly President of American Express), took over as CEO.  Although Visa told the public that Scharf resigned to spend more time with his family, such a justification does not explain why he resigned at a board meeting without notice.  The fact that a board member stepped in to replace him further suggests that Visa's publicly stated reason was a pretext, as board members typically only replace top executives in emergencies.

11.     In December 2016, JPMorgan's CEO, Jamie Dimon, announced that the company had sustained a $200 million to $300 million loss on its new Chase Sapphire Reserve card.  Dimon told the public that the loss was due to the lucrative rewards that JPMorgan offered consumers who signed up for the Chase Sapphire Reserve, but loyalty from those customers would make up for the loss over time.

12.     Scott Blum, the founder and CEO of Plaintiff, was perplexed by JPMorgan's explanation for the loss, so he contacted Murray Abrams, the Executive Vice President of Corporate Development at Capital One, to get his take on the matter.  Mr. Abrams told Mr. Blum that, around the same time that JPMorgan announced its massive loss, Visa caused Capital One to sustain its own $150 million loss.  Mr. Blum construed Mr. Abrams' response as a suggestion that Visa caused JPMorgan and Capital One to sustain losses when it discovered the conspiracy and put an end to it.   Perhaps realizing that he had revealed too much, Abrams then tried to backtrack, and said that Visa had taken $150 million in marketing from Capital One and reallocated it to Costco, an explanation that made no sense.

13.     On December 1, 2017, Jim McCarthy, Visa's head of innovation, was fired by Visa for "violating Visa policy."  No additional reason was provided for this high-profile

4

dismissal.  McCarthy had been at Visa for 18 years and had taken the lead in orchestrating the marketing agreement with Plaintiff.

14.     The public justifications for these events do not withstand scrutiny, but the events can be explained by an alternative theory: Visa was paying JPMorgan and Capital One, then two of its biggest bank partners, in order to gain control of and manipulate the newly-created affluent credit card market.  It appears that Visa's board moved to end the scheme by forcing Scharf out, replacing him with one of its own members.  It also appears that, under new leadership, Visa stopped paying the other defendants (in cash or marketing perks) for participating in the conspiracy against Plaintiff.  Without the anticipated payments from Visa, JPMorgan and Capital sustained massive losses, and apparently made up stories (about the Chase Sapphire Reserve and Costco) to explain those losses. Finally, it appears that once it discovered McCarthy's role in the conspiracy, Visa summarily fired him.

15.     By the time Scharf resigned and the conspiracy began to unravel, however, the Defendants' conduct had already caused considerable harm to Plaintiff's business.  During the transition from the Visa network to the MasterCard network, Plaintiff lost ten percent of its customer base (despite increasing the rewards available to customers).  In addition, Plaintiff could not obtain returns on the hundreds of millions of dollars it had invested in developing a "Visa Black Card" brand.  And, perhaps most importantly, Visa prevented Plaintiff from releasing two new products to consumers—and obtaining revenues from those products—for more than a year.  The Defendants' conduct also injured consumers, who were deprived of the opportunity to learn about and purchase Plaintiff's products.

16.     Plaintiff brings this action under Section 1 of the Sherman Act, 15 U.S.C. §1, to hold Visa, JPMorgan, and Capital One accountable and to recover for their anticompetitive conduct.

## II.     JURISDICTION AND VENUE

17.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C., §§ 15 and 26, to recover treble damages resulting from lost business due to the Defendants' anticompetitive agreements in violation of Section 1 of the Sherman Act.  Plaintiff also seeks attorneys' fees and other costs to the extent they are permitted by law.

18.     This Court has subject-matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337, 2201, and 2202.

19.     Venue lies in the Western District of Wisconsin under 28 U.S.C. § 1391 because each Defendant transacts business and/or is found within this District.  The District is also home to a substantial part of the interstate commerce involved in and affected by the Defendants' antitrust violations.  Finally, the Defendants' anticompetitive conduct had substantial anticompetitive effects in the District.

20.     Jurisdiction over the Defendants comports with the United States Constitution and with 15 U.S.C. §§ 15, 22, and 26.

## III.     PARTIES

**A.     PLAINTIFF**

21.     Plaintiff BLACK CARD LLC d/b/a/ LUXURY CARD is a limited liability company organized under the laws of Wyoming, with its principal place of business in Jackson, Wyoming.

22.     Black Card was founded in 2007 by Scott Blum, the founder and former CEO of Buy.com.

6

23.     Black Card creates co-branded credit cards for individuals with exceptionally good credit ratings.  Black Card provides the marketing and rewards program that attracts customers to elite credit cards.  Black Card partners with an issuing bank, currently Barclays Bank Delaware (Barclays), to issue the cards.

24.     In December 2008, Black Card issued its first cards for its new product, the Black Card.

25.     The Black Card quickly gained popularity: By 2013, Black Card had opened more than 75,000 accounts.

26.     In 2014, Black Card LLC rebranded, and began to do business under the name "Luxury Card."  Today, Luxury Card offers three products: the MasterCard Titanium Card, the MasterCard Black Card, and the MasterCard Gold Card.

## B.     DEFENDANTS

### 1.     Visa

27.     Defendant, VISA INC., is a Delaware corporation with its principal place of business in San Francisco, California.

28.     Visa Inc. owns and operates an electronic network for processing credit card transactions.

29.     Defendant VISA U.S.A., INC. is a subsidiary of Visa Inc., which manages Visa Inc.'s operations in the United States

30.     In 2006, when Plaintiff's trouble with Visa began, Visa Inc. was not yet a corporation.  Instead, Visa operated internationally as Visa International Service Association and domestically as Visa, U.S.A., Inc.— associations composed of thousands of banks, including JPMorgan and Capital One.   Each of Visa's member banks either: (a) issued credit cards; or (b)

7

accepted credit card payments on behalf of merchants.  The member banks shared the technology that made credit card transactions possible.

31.     Because Visa operated to help its member banks, representatives of major banks sat on Visa, U.S.A., Inc.'s board of directors, where they openly cooperated to maximize profits for their own banks and other financial institutions.  Visa, U.S.A., Inc.'s 2006 board of directors included representatives from JPMorgan, U.S. Bancorp, Texas First Bank, Wachovia Corporation, First National Bank, National City Corporation, Washington Mutual, Wells Fargo & Company, and SunTrust Banks, Inc.  Even within this family of close, cooperative relationships, JPMorgan's close relationship with Visa stood out.  For example, JPMorgan was the only bank to have two executives—Charles Scharf and William Campbell—serving on Visa U.S.A., Inc.'s board of directors in 2006.

32.     In 2007, in an attempt to avoid antitrust liability, Visa restructured its operations across the globe and formed a new parent corporation, Visa Inc.  On March 18, 2008, the Visa Inc. held an initial public offering (IPO) and became Visa Inc. a publicly held company.  Visa's member banks became Visa Inc.'s customers, and paid Visa Inc. for the right to use its electronic payment network.

33.     During the restructuring, Visa made Visa U.S.A., Inc. a subsidiary of Visa Inc.

34.     Despite the restructuring, Visa Inc.'s 2008 board of directors included several individuals with senior management positions at major banks.  For example, board member Charles Scharf was JPMorgan's Chief Executive Officer of Retail Financial Services, and board member David I. McKay was the Executive Vice President of Personal Financial Services at the Royal Bank of Canada.

8

35.     Furthermore, even after the restructuring, Visa Inc. continued to refer to its bank customers as "members" and operated principally for their benefit.

### 2.     Capital One

36.     Defendant Capital One Financial Corporation is a Delaware corporation with its principal place of business in McLean, Virginia.

37.     Defendant Capital One Bank (USA), N.A. is a wholly owned subsidiary of Capital One Financial Corporation, organized under the banking laws of the United States with its principal place of business in McLean, Virginia.

### 3.     JPMorgan Chase

38.     Defendant JPMORGAN CHASE & CO. is a Delaware corporation with its principal place of business in New York, New York.

39.     Defendant JPMORGAN CHASE BANK, N.A. is a wholly owned subsidiary of JPMorgan Chase & Co, organized under the banking laws of the United States with its principal place of business in New York, New York.  JPMorgan Chase Bank, N.A. operates JPMorgan Chase & Co.'s private banking and wealth management divisions.

40.     Defendant CHASE BANK USA, N.A. is another wholly owned subsidiary of JPMorgan Chase & Co, organized under the banking laws of the United States with its principal place of business in New York, New York.  Chase Bank USA, N.A. offers savings accounts, credit cards, mortgage loans, and investment services to consumers.

41.     This case turns on an agreement between Visa and JPMorgan, which Capital One later joined, to impede Plaintiff's efforts to market and promote its card effectively.  To understand why Visa and JPMorgan would make such an agreement, it is important to understand their unique relationship.

9

42.      For at least the last ten years, JPMorgan has exercised enormous leverage over Visa.  As several news outlets have noted, JPMorgan issues more Visa cards than any other bank.[1]  At the same time, JPMorgan "operates one of the biggest merchant-acquiring businesses, Chase Paymentech, which handles [Visa] card transactions for retailers."[2]  In 2012, Reuters reported that JPMorgan accounted for roughly 10 percent of Visa's profit.[3]  That number has only grown over time, as JPMorgan has moved more of its cards to the Visa network.

43.      Moreover, JPMorgan has repeatedly threatened to transfer business to its own payment network—Chase Pay—rather than relying heavily on the Visa network.  If JPMorgan transferred business to its own network, Visa would suffer financially.

44.      To keep JPMorgan's business, Visa has consistently asked JPMorgan executives to serve in leadership roles in Visa and otherwise provided JPMorgan with special deals not available to any other bank.

## IV.      TRADE AND INTERSTATE COMMERCE

45.      The affluent credit cards involved in this case are marketed, sold and used in the flow of interstate commerce.  In addition, Plaintiff's and Defendants' cards are used to finance a substantial dollar amount of interstate commerce: Experts estimate that there will be roughly $2.5 billion of transactions on Plaintiff's cards alone this year.  The vast majority of those transactions will occur within the United States.

---

[1]      Daniel Roberts, *Charles Scharf: Visa's open-armed leader*, Fortune (Sept. 4, 2014), http://fortune.com/2014/09/04/charles-scharf-Visa.

[2]      Andrew R. Johnson & Matthias Rieker, *J.P. Morgan to Offer Deals In Visa Partnership*, WALL STREET JOURNAL (Feb. 26, 2013), https://www.wsj.com/articles/SB10001424127887324338604578328352611255658.

[3]      *Visa hires JPMorgan's Charles Scharf as CEO*, REUTERS (Oct. 24, 2012), https://www.reuters.com/article/us-Visa-ceo/Visa-hires-jpmorgans-charles-scharf-as-ceo-idUSBRE89N0WY20121024.

## V.     FACTUAL BACKGROUND

**A.     THE MECHANICS OF CREDIT CARD TRANSACTIONS**

46.     Every credit card in the United States is associated with: (a) an issuing bank (such as Wells Fargo or Bank of America), which loans money to the credit card holder to pay for goods and services; and (b) a company that processes credit card transactions over an electronic payment network (such as Visa or MasterCard).

47.     To obtain a credit card, a customer must submit an application to an issuing bank. If the bank determines that the customer is creditworthy, the bank extends a line of credit to the customer and gives the customer a physical card, which the customer can use purchase goods and services with the bank's funds.

48.     When a customer swipes his or her card at a store, the card reader sends information about the customer's purchase over an electronic payment network to the merchant's bank, which forwards the information to the issuing bank.  The issuing bank then notifies the merchant's bank—over the electronic payment network—that it will cover the cost of the cardholder's purchase, and the merchant's bank relays that information to the merchant.  The issuing bank later bills the customer for his or her purchases.

49.     For example, imagine that a customer uses a BankAmericard to buy groceries. The BankAmericard is issued by Bank of America and operates over the MasterCard network. Thus, when the customer swipes her card at the grocery store, the card reader sends an electronic request for funds across MasterCard's network to the grocery store's bank, which forwards the request to Bank of America.  Bank of America then sends a message back across the MasterCard network, notifying the grocery store's bank that it will cover the cost of the customer's food. Finally, the grocery store's bank sends a message back to the store that the credit card transaction has been approved.  All of that messaging happens in a matter of seconds.

11

50.     Both issuing banks and credit card network companies profit from credit card transactions.  Issuing banks profit from merchants—who pay small fees to issuing banks each time the issuing banks cover the cost of a cardholder's purchase—and from cardholders—who pay fees to obtain credit cards or interest on their credit card bills.  By contrast, the payment network companies profit from issuing banks and merchants' banks, which pay the companies for facilitating credit card transactions.

51.     Some credit cards are associated not only with an issuing bank and a payment network, but also with a "co-brand partner" that markets the card and provides rewards to cardholders.   Often, these co-brand partners are hotel chains or airlines that provide discounted hotel stays or flights for individuals who use a particular card.  For example, Marriott is a co-brand partner of JPMorgan Chase Bank, which issues the Marriott Rewards Premier credit card.  For every dollar that customers spend on the card, they earn points that can be exchanged for a free stay at a Marriott hotel.  Similarly, United Airlines is a co-brand partner that markets JPMorgan's United MileagePlus Explorer card.  Customers using that card are eligible for a free checked bag on United flights and—if they spend enough money on the card—free plane trips.

52.     Co-brand partners generally profit from issuing banks, which pay the co-brand partners to market their cards.  Occasionally, however, a credit card network company will hire a co-brand partner to market a card that is a particularly important source of revenue for the network.  Credit card networks typically hire co-brand partners to market their cards where either the card is expected to drive an exceptionally high volume of traffic to the network or where there are strategic reasons that make it desirable for the network to maintain a strong affiliation with the co-branded card.

**B.     ORIGIN OF THE AFFLUENT CREDIT CARD MARKET**

53.      The affluent credit card market was born out of an urban legend.  In the 1980s and 1990s, the most exclusive and coveted credit card on the market was perhaps the American Express Platinum Card.  In exchange for an annual fee (which was $250 when the Platinum Card was launched in 1984), Platinum Card holders were entitled to collect rewards, including travel benefits.  The Platinum card was not a true credit card, but rather a charge card, requiring . customers to pay the full amount they owed each month.

54.      In the 1990s, there were rumors of a secret black charge card that far outclassed the Platinum Card; apparently, the card was only issued to celebrities and extremely wealthy individuals, who could use it to purchase almost anything.   In 1999, American Express capitalized on the black card legend by issuing the Centurion Card—an exclusive charge card printed on a black background.  Centurion Cards are not available to the general public; rather, American Express invites its wealthiest customers to apply.  While American Express does not publish its Centurion Card requirements, experts estimate that current invitees must have spent and paid off at least $450,000 across all of their American Express accounts.   To accept American Express's invitation for a Centurion card, a customer must pay a $7,500 initiation fee and a $2,500 annual fee.  In exchange for those fees, Centurion cardholders have access to a concierge service, travel benefits, and special privileges at some retail stores.

55.      In 2006, Scott Blum, who has used both Platinum and Centurion Cards, noticed serious shortcomings with both products.  Most notably, both cards were charge cards, meaning that cardholders had to pay off the full balance on their cards each month.  That was a problem for entrepreneurs like Mr. Blum, who wanted to be able to use their credit cards to cover the costs associated with starting new business, and then pay the balance on the cards off over a longer period of time.  Moreover, while the Centurion card was extremely expensive, it did not

13

offer the level of service that Mr. Blum expected.  For example, the Centurion concierge service excelled at making travel arrangements but fell short on other tasks.  At the same time, American Express placed restrictions on Centurion cardholders' ability to use their travel benefits.

56.    Ultimately, Mr. Blum concluded that it would be possible to design a credit card with roughly the same annual fees as the Platinum Card, the luxury rewards promised (but not always delivered) by the Centurion Card, and the flexible payment schedules of ordinary credit cards (which allow consumers to pay off large purchases over a long period of time).   That sort of supercard would be so distinctive that it could create a new type of credit card market, in which banks and their co-brand partners competed to provide the ultimate rewards package to individuals with extremely strong credit histories.  Such a market would be enormously profitable for banks and credit card networks, while bringing enormous benefits to consumers.

57.    Shortly after conceiving of this idea, Mr. Blum acquired the trademark for the term "Black Card" and several other related marks, with the intent of using these marks to market his distinctive card.

58.    Mr. Blum had successfully partnered with JPMorgan to issue a co-branded credit card on behalf of his previous company, Buy.com. He therefore approached JPMorgan in early 2006 and proposed that JPMorgan issue a new affluent credit card with Mr. Blum's new company, Black Card, serving as JPMorgan's co-brand partner, creating and managing a rewards program for cardholders.  JPMorgan was very receptive to the proposal, and over the course of 2006, JPMorgan and Mr. Blum drafted a contract to govern their partnership; in early 2007, Mr. Blum signed it.  JPMorgan, however, mysteriously refused to sign the agreement for six months.

59.    Finally, JPMorgan informed Mr. Blum that, instead of partnering with him, it planned to develop its own affluent credit card.  JPMorgan then hired Gordon Smith—an

14

American Express executive—to serve as the new Chief Executive Officer of JPMorgan's Card, Merchant Services and Auto Finance business.  Smith immediately set to work "going after high-end consumers."[4]

## C.    THE ANTICOMPETITIVE AGREEMENTS

### 1.    Origin of the Conspiracy

60.    JPMorgan was initially so enthusiastic about the potential partnership with Mr. Blum that JPMorgan even invited Mr. Blum to speak to an assembled group of its private banking customers about entrepreneurship, which he did.

61.    JPMorgan also initially seemed to embrace the idea of partnering with Plaintiff as one of the first cards to be carried on its own proprietary payment network.  When Plaintiff was in the process of negotiating its partnership contract with JPMorgan—which JPMorgan later refused to sign—JPMorgan asked Plaintiff if it would agree to use the soon-to-be-launched proprietary JPMorgan payment network, Chase Pay, once it was up and running.  Plaintiff said that it would.  The launch of Chase Pay would have put JPMorgan in direct competition with Visa for payment network traffic.  For reasons then unknown to Mr. Blum, JPMorgan decided to defer the launch of Chase Pay and continue relying on the Visa network.

62.    At some point between January and June of 2007, it appears that JPMorgan and Visa decided to take Mr. Blum's ideas for an affluent credit card and cut him out of the equation.  Without Plaintiff in the picture, Visa and JPMorgan could take all of the profits from an affluent card for themselves.  But JPMorgan and Visa had a problem: Mr. Blum was determined to start a small business to bring his credit card to market, and would likely find another bank to serve as his partner if JPMorgan backed away from the deal.  Competing against a nimble, upstart

---

[4]    Andrew Bary, *Elite Credit-Card Fight*, BARRON'S (March 3, 2012), https://www.barrons.com/articles/SB50001424052748703754104577239323202634852.

company would be difficult, and Plaintiff's product would likely pull customers away from any alternative product that Visa and JPMorgan would launch.

63.     Subsequent events suggest that Visa and JPMorgan, therefore, hatched a plan to team up to impede Plaintiff's success in the affluent credit card market.

64.     In June 2007, in furtherance of and shortly after forming its conspiracy with Visa, JPMorgan informed Mr. Blum that it would not sign the partnership contract with Plaintiff. Instead, it would create its own card to compete with the Black Card.

65.     Mr. Blum thereafter sought out Barclays to be his partner.  In July 2008, Plaintiff and Barclays signed a partnership agreement.

66.     One month later, in August 2008, Barclays informed Visa about its partnership with Plaintiff.  At that point, Visa took its first steps to implement the conspiracy, offering to create a marketing partnership with Plaintiff.  Visa told Plaintiff that the partnership was to promote the growth of the Black Card brand and its affiliation with the Visa network.  It became clear later, however, that Visa's true goal was to hamper and control Plaintiff's marking efforts and to stifle the growth of the Black Card.

67.     At a meeting with Plaintiff and Barclays on September 9, 2008, Visa told Plaintiff and two Barclays executives (Ann-Marie Archino and Paul Wilmore) that Visa wanted to form a promotional deal with Plaintiff.   This request was surprising.  It was extremely unusual for a network like Visa to offer a co-brand partner a promotional deal, particularly when that co-brand partner was a small, start-up business like Plaintiff.  But Visa told Plaintiff that it wanted to be in business together because Plaintiff's card had enormous potential, and an association with a successful affluent credit card product could boost Visa's image.

16

68.     Plaintiff and its executives had never been party to such an agreement before, and so sought assurances from Visa that the terms of the agreement were standard in the industry. Executives from Visa, including Jim McCarthy, repeatedly assured them that they were, and that Plaintiff was getting the same deal as all of Visa's other co-brand partners.

69.     Plaintiff, believing Visa's representations about the stock nature of the marketing agreement and its promises that Visa wanted to help build Plaintiff's brand, accepted Visa's proposal.  In November 2008, Plaintiff signed the promotional agreement with Visa (the Promotional Agreement or Agreement), under which Visa would pay Plaintiff to "launch . . . a Visa-branded . . . Black Card" and "actively market" the card for five years.  The agreement required the Black Card to remain on the Visa network for those five years.  Because the Black Card was "Visa-branded," the Promotional Agreement also gave Visa the right to review Plaintiff's promotional materials before Plaintiff circulated them.  In other words, the Promotional Agreement gave Visa control over Plaintiff's marketing materials and strategy.

70.     In addition, Plaintiff has since learned that, contrary to Visa's repeated representations, the payment structure in the Promotional Agreement was not standard in the industry; in fact, it was quite unusual.  Ordinarily, when an issuing bank or a credit card network wants to work with a co-brand partner to market a credit card, the bank or the network will often give the co-brand partner a large capital infusion at the beginning of their relationship to get a marketing campaign started.  The Promotional Agreement that Visa offered Plaintiff did not include any sort of up-front capital infusion for marketing the Black Card.  Instead, the Promotional Agreement provided payment to Plaintiff only *after two years* and only if Plaintiff's performance in the second year was better than its performance in the first.  It likewise offered

17

Plaintiff money after three years if Plaintiff's performance in the third year was better than its performance in the second, etc.

71.     The amounts of money provided to Plaintiff under the Promotional Agreement were likewise highly unusual.  Plaintiff has since learned that these Promotional Agreements more typically involve the payment of hundreds of millions of dollars from Visa to the co-brand partner or issuing bank to promote the card.  Plaintiff's agreement, by contrast, provided Plaintiff only an average of $120,000 a year.

72.     The lack of an up-front capital infusion to help Plaintiff launch a marketing campaign and the miniscule amount of the payments under the Promotional Agreement demonstrates that Visa was not truly interested in boosting awareness of Plaintiff's product:  It was only interested in gaining control over Plaintiff's advertising process to further its conspiracy with JPMorgan.

73.     Unaware that the lack of a capital infusion and the small payments were a red flag, Plaintiff believed that the promotional agreement reflected Visa's interest in forming a mutually beneficial partnership and building a "Visa Black Card" brand.

74.     Over the course of the next six years, however, it became clear that Visa was interested in just the opposite.  Pursuant to its agreement with JPMorgan, Visa used its contractual power over Plaintiff to undermine Plaintiff's business.

## 2.     The Launch of Black Card

75.     Visa's attempts to undermine Plaintiff began before the Black Card had even launched.  They were well-disguised, however, and so Plaintiff did not appreciate their import until much later.

76.     As early as September 2008, Visa executives told Plaintiff that Visa was concerned about a potential legal dispute between Plaintiff and American Express.  The Visa

18

executives knew that American Express had used "color as a key branding mechanism for its cards."[5]  The card colors helped users identify the user fees and benefits for different American Express cards, and even distinguished American Express cards from those issued over other networks.[6]  American Express now offers a "Gold Card," a "Platinum Card," "Blue from American Express," the "Plum Card," and the "Zync Card," all with different eligibility criteria and user rewards.[7]  In light of American Express's emphasis on card color—and the urban legends about an exclusive black card—American Express's Centurion card was colloquially known as the "American Express Black Card."  Nevertheless, American Express abandoned the "Black Card" trademark.  Plaintiff was therefore able to claim the "Black Card" trademark in 2007.

77.    Upon information and belief, Visa executives were aware that, when Plaintiff introduced its "Black Card," American Express would recognize that it missed a critical marketing opportunity when it named its luxury card the "Centurion Card," rather than the "Black Card." Visa anticipated that American Express would try to compensate for its marketing misstep by challenging Plaintiff's trademark rights in court.  If American Express brought such a challenge, it would likely argue that it was too easy for consumers to mistake Plaintiff's "Black Card" for an American Express card.

78.    To mitigate the possibility that Plaintiff would fall into legal trouble, Visa could have encouraged Plaintiff to use the name "Visa Black Card," rather than "Black Card," because it would be difficult to mistake a Visa Black Card for an American Express product.  In fact, one

---

[5]    *Am. Exp. Mktg. & Dev. Corp. v. Black Card LLC*, No. 10 CIV. 1605 DLC, 2011 WL 5825146, at *1 (S.D.N.Y. Nov. 17, 2011)

[6]    *Id.*

[7]    *Id.*

of the key terms of Plaintiff's eventual settlement with American Express was that Plaintiff's marketing materials for the Black Card would prominently display either an image of the card showing the Visa logo, or the words "Visa Black Card."

79.     But Visa used its contractual power over Plaintiff to demand that Plaintiff *avoid* the name "Visa Black Card."   In October 2008, Visa told Plaintiff that it would not approve advertisements with a headline referring to Plaintiff's product as the "Visa Black Card." Plaintiff would have preferred to use the term "Visa Black Card" to immunize itself from litigation with American Express, but Visa insisted that the term was problematic.  Eventually, Visa allowed Plaintiff to use some "Visa Black Card" advertisements that Plaintiff had already designed and printed, but Visa cautioned that, in designing new advertisements, Plaintiff should refer to its product simply as "the Black Card."

80.     In December 2008, Plaintiff debuted the Black Card.

81.     The Black Card offered several advantages over the American Express Platinum and Centurion cards.  Perhaps most importantly, the Black Card prioritized its concierge service, training concierge staff to handle any request a customer might make.  In addition, the Black Card's reward points never expired and could be used on any airline at any time.  Finally, with annual fees of $495 per year, the Black Card was considerably less expensive than the Centurion card.

82.     After the Black Card's launch, Visa continued to pressure Plaintiff to avoid the term "Visa Black Card" in the headings of its advertisements.  And on several occasions between December 2008 and April 2009, Visa instructed Plaintiff not to use the name "Visa Black Card" even in the subheadings of its promotional materials.

83.     Visa claimed that the name "Visa Black Card" was problematic because Visa's banking customers might become confused and think that they could issue a Black Card over the Visa network (when, in reality, only Barclays had the power to issue Black Cards).  If Visa's banking customers really were confused, Visa could have solved the problem easily by sending a letter to all of its customers, explaining its relationship with Black Card.  Or, better still, Visa could simply wait to see if banks contacted Visa and asked for permission to issue a Black Card; then, Visa staff could simply reply, "I'm sorry, but Barclays has an exclusive right to issue Black Cards."  The fact that Visa did not employ either of these simple solutions, or provide any evidence of a single customer complaint or query on this issue, demonstrates that Visa's story about "customer confusion" was a pretext.  Visa's true goal was to force Plaintiff to print advertisements that referred to its product as "the Black Card," so that Plaintiff would be sued by American Express and be bogged down in litigation.

84.     In August 2009, less than a year after Barclays began issuing the Visa Black Card, JPMorgan launched its own high end credit card: the Chase Sapphire Preferred Card.  The Sapphire Card closely resembled the Black Card, with flexible travel benefits and low annual fees.

85.     With the launch of the Chase Sapphire Preferred Card, there were essentially three competitors in the affluent card market: Black Card; the Chase Sapphire; and the American Express Platinum Card.

### 3.     The American Express Litigation

86.     Just as it appears Visa and JPMorgan had hoped and anticipated when they manipulated Plaintiff's advertising campaign, American Express sued Plaintiff in 2010, challenging its registered trademark on the term "Black Card."  American Express claimed that customers might be confused about the difference between the American Express Centurion and

Plaintiff's Black Card.  American Express also argued that the term "Black Card" was descriptive and, accordingly, could not be trademarked.

87.     Coming shortly on the heels of JPMorgan's launch of its Sapphire card, the timing of the litigation could not have been worse for Plaintiff and better for JPMorgan and Visa. At the very least, the litigation would impose significant costs on Plaintiff, both in terms of litigation costs but also the cost of uncertainty regarding its future use of the trademarks so central to its brand.  It was also a considerable distraction to Plaintiff.

88.     Even if Plaintiff prevailed in the litigation, Visa still had a plan to use that victory to wrest control of Plaintiff's trademarks and drive Plaintiff from the market.  During the litigation, Visa's then-CEO, Joe Saunders, met with Plaintiff and said that, if Plaintiff won the litigation with American Express, Visa would be interested in buying Plaintiff and all of its assets.  If Visa owned Plaintiff and the mark, Visa could dismantle Plaintiff's business and keep the valuable "Black Card" trademark for itself.

89.     Plaintiff, however, foiled the Defendants' plans.  In February 2012, Plaintiff settled its dispute with American Express.  The settlement provided that American Express would assume ownership of the "Black Card" trademark, but Plaintiff would have a perpetual license to use the mark.  In addition, the settlement provided that Plaintiff could "operate only a single family of BLACK CARD payment cards," and the cards could only operate over one network at a time.  Marketing materials for those cards would either: (a) display a prominent image of the card showing the logo of the card's payment network; or (b) use the name of the card network before the card's name.  So, for example, Plaintiff's marketing materials for the Black Card would either: (a) display a prominent image of the card bearing the Visa logo; or (b) include the name "Visa Black Card."

22

90. The specific terms of Plaintiff's settlement with American Express effectively prevented Visa from buying Plaintiff and using the "Black Card" trademark however it saw fit. For example, Visa could not buy Plaintiff and then license the "Black Card" trademark to all of its largest banking customers (including JPMorgan). The conspirators therefore turned to other strategies to suffocate Plaintiff's business.

91. While Visa and JPMorgan's hopes that the American Express litigation would strip Plaintiff of its trademark and its business model were not realized, the litigation did plenty of harm to Plaintiff's ability to leverage its first-mover advantage to take the lead in the affluent credit card market.

92. As Plaintiff was bogged down in costly litigation with American Express, the number of big banks in the affluent credit card market increased. As Barron's explained, "[b]anks issuing credit cards used to make the bulk of their money on credit-lending and related charges, like late fees, but the recession cut sharply into lending activity with card borrowing down more than 15% from the 2008 peak. Tougher federal consumer protection laws . . . also [ate] into lending profitability. Which is why much of the credit-card industry . . . [was] increasingly focused on the high-rolling consumers . . . ."[8]

93. When Plaintiff finally settled the American Express litigation in a way that allowed it to retain the use of its coveted trademark, the landscape of the affluent credit card market had drastically changed; it was not necessarily more competitive from a consumer standpoint, but there were more large Visa partners in the market making it even harder for Plaintiff to regain its lost momentum. In this sense, Visa and JPMorgan had partially succeeded in their conspiracy against Plaintiff.

---

[8] *Bary, Elite Credit-Card Fight.*

23

### 4. Capital One Joins the Conspiracy

94.    In 2012, right around the time of the settlement of the American Express litigation, several events occurred that both deepened and broadened the conspiracy between JPMorgan and Visa.

95.    In 2012, Visa asked Charles Scharf to become Visa Inc.'s CEO.   Scharf had occupied multiple leadership roles at JPMorgan, and was considered a "protégé and possible successor" to JPMorgan's CEO, Jamie Dimon.[9]   Commentators noted that Scharf was a "no-surprise hire," given Visa's "close" relationship with JPMorgan.  Six months later, Visa hired Ryan McInerney—also a JPMorgan executive—as Visa's President.

96.    Also in 2012, roughly one year before Barclays' exclusive right to issue Black Cards was set to expire, Plaintiff approached Capital One and asked to if Capital One would be interested in acquiring Plaintiff and replacing Barclays as the issuing bank for the Black Cards.

97.    In February 2013, roughly three months after Scharf took the helm at Visa and shortly after Capital One began discussions to acquire Plaintiff, Visa announced a "new and expanded" partnership agreement with JPMorgan.[10]  Under the terms of the partnership agreement, JPMorgan promised to use the Visa network to process the vast majority of JPMorgan credit card transactions over the next decade.  The parties understood that JPMorgan's promise to use the Visa network included an implicit promise not develop its own payment network to compete with Visa's.

---

[9]    Jennifer Surane, Charles Stein, & Sonali Basak, *BNY Mellon Appoints Tech-Focused Charles Scharf as Its CEO*, BLOOMBERG (July 17, 2017), https://www.bloomberg.com/news/articles/2017-07-17/bank-of-new-york-mellon-names-scharf-ceo-replacing-hassell.

[10]    Press Release, Visa Inc., Visa Inc. and JPMorgan Chase Sign Letter of Intent for New and Expanded Partnership Agreement (Feb. 26, 2013), http://pressreleases.Visa.com/phoenix.zhtml?c=215693&p=irol-newsArticle&ID=1789390.

2307696.1

98.     In exchange, Visa "allowed [JPMorgan] to essentially lease Visa's network for 10 years at what industry sources said is a fixed rate."[11]  Visa also agreed to waive some fees for merchants who accepted JPMorgan credit cards if those merchants had JPMorgan bank accounts.[12]  It was highly unusual for Visa to sign such a deal, which made not just JPMorgan Visa cards—but also JPMorgan banking services—more attractive to consumers.

99.     The unique nature and grand scope of this deal set the stage for a deeper conspiracy between the two companies.  Under the agreement, Visa was obligated to make JPMorgan happy and became even more reliant on JPMorgan's business for its own profitability.  Likewise, JPMorgan tied its fate to Visa.  Thus, both companies had powerful incentives to continue to engage in anticompetitive collusion and to further their conspiracy.

100.    Just a few weeks later, on March 15, 2013, Capital One and Plaintiff reached an agreement in principle (the Capital One Agreement), which provided that Capital One would acquire Plaintiff but retain Plaintiff's staff as Capital One employees and advisors.  Just as importantly, the Agreement promised that Capital One would give Plaintiff the capital infusion that it never received from Visa: "a minimum of $150 million [for] marketing over the first three years" of the agreement.  Because the parties spent considerable time negotiating this deal, the Agreement provided that, if Capital One backed out of the arrangement without justification, it would pay Plaintiff $10 million.

101.    As the Black Card operated over the Visa Network, the Capital One Agreement contained a provision in which Capital One reserved the right "to discuss the [Agreement] and

---

[11]   David Henry, *JPMorgan uses its might to cut costs in credit card market*, REUTERS (Sept. 8, 2015), https://www.reuters.com/article/us-jpmorganchase-creditcards-insight/jpmorgan-uses-its-might-to-cut-costs-in-credit-card-market-idUSKCN0R80B620150908.

[12]   *Id.*

related information with Visa." In early or mid-2013, Capital One exercised this right, and told

Visa about the contours of the Agreement.

102.    Upon information and belief, when Visa and JPMorgan heard of the Agreement,

they panicked: With the capital infusion that Capital One was offering, Plaintiff's business could

truly flourish. Visa and JPMorgan decided they must stop this deal, and that the best way to do

so was to pay Capital One to back away from it. Ultimately, Visa and JPMorgan paid Capital

One at least $150 million to end its relationship with Plaintiff.

103.    To protect it and its major bank customer's lucrative hold on the affluent credit

card market, Visa viewed the cost to pay off Capital One as less expensive than the costs of

allowing a disruptive maverick like Plaintiff to gain a foothold with the backing of a major

financial institution like Capital One.

104.    This was particularly true because Capital One's rewards card—the Capital One

Venture Card—was not such a serious threat to Plaintiff and JPMorgan's affluent credit card

business: While the Capital One Venture Card offered travel benefits to consumers, it did not

offer the full complement of services that the Black Card offered. (Indeed, that is why Capital

One was so keen to acquire Plaintiff.) Ultimately, by funneling money to Capital One in the

form of marketing payments to support the Venture Card, Visa and JPMorgan were able to pull

Capital One into the conspiracy.

105.    After Visa paid Capital One, Capital One executive Murray Abrams called

Plaintiff to say that Capital One was having second thoughts about acquiring Plaintiff and asked

to renegotiate the terms of the deal. Plaintiff suspected that the renegotiation proposed by Mr.

Abrams was a pretext to get out of the acquisition without paying the breakup fee. Plaintiff

therefore acceded to all of Mr. Abrams requests to change the terms for the acquisition. A short

2307696.1

time later, however, Mr. Abrams sought to renegotiate the terms again and again Plaintiff met his demands.  Nevertheless, on August 6, 2013, Mr. Abrams told Plaintiff that Capital One still wanted to back out of the deal, and would pay Plaintiff the $10 million breakup fee.

### 5.    Interference with Plaintiff's Advertising and Product Launches

106.    Capital One's near acquisition of Plaintiff demonstrated the continued vitality of Plaintiff's business.  Alarmed by that prospect, JPMorgan and Visa developed a new, three-pronged strategy to stifle Plaintiff's business: (a) disrupt Plaintiff's advertising campaign at critical moments; (b) prevent Plaintiff from running advertisements that highlighted the strengths of Plaintiff's Black Card; and (c) prevent Plaintiff from introducing new products.

### a.    Disrupting Plaintiff's Advertising Campaign

107.    Visa repeatedly and unreasonably refused to approve Plaintiff's proposed advertisements for the Black Card, sapping the momentum from Plaintiff's advertising campaign.

108.    Plaintiff was one of the first companies to recognize that, if an affluent credit card looked elegant and distinctive, the card could become a status symbol for affluent individuals.  As a result, in October 2013, Plaintiff changed the composition of the Black Card to stainless steel and a patented carbon back.  The sleek, heavy card offered incredible potential for the Black Card brand.  Thus, Plaintiff developed a multifaceted advertising campaign for the "new Visa Black Card," which highlighted the metal card's appearance.  The advertising campaign included television, digital, print, billboard, and mail advertisements that were calculated to build excitement about the card over a twelve month period.  The campaign therefore included advertisements that would be released each month between October 2013 and October 2014.

109.    But Visa threw a wrench into this carefully calibrated advertising strategy.  On December 16, 2013, Barclays sent the proposed designs for Plaintiff's January direct mail

marketing campaign to Visa for approval (as required by the Promotional Agreement). In a note accompanying the materials, Barclays observed that the proposed designs were not "fundamentally new or different" from designs that Plaintiff had submitted in the past months. But Visa refused to approve them. On December 17, 2013, Visa executive Mike Bordner told Barclays that the advertisements had not been approved because they contained the name "Visa Black Card," and Visa was concerned that the name was confusing to consumers, who might believe that Visa was an issuing bank.

110.    Barclays attempted to schedule a meeting with Mr. Bordner or another Visa executive to try to resolve the issue, but Visa repeatedly postponed the meeting without proposing an alternative date or time. When Barclays was finally able to meet with Visa executives and explain its understanding that there was no customer confusion, Visa still refused to approve the materials. Then, without warning, Visa changed its stance and approved the advertisements with the "Visa Black Card" name, more than four weeks after Plaintiff submitted them. Visa's change in position shows that it was not taking a principled stand to protect consumers; it was simply interfering with Plaintiff's advertising strategy. Because of Visa's conduct, Plaintiff was not able to mail its January materials until mid-February, and was not able to mail its February materials until March. Plaintiff therefore lost momentum at a crucial point in its campaign for the "new Visa Black Card."

111.    On four occasions between January and September of 2014, Visa again made pretextual protests to advertisements containing the name "Visa Black Card." These protests varied slightly each time. At times, Visa claimed that some banks were confused by the use of the phrase "Visa Black Card." According to Visa, the banks believed that Black Cards were a type of Visa card issued by multiple banks (rather than by Barclays alone); as a result, the banks

28

allegedly asked Visa if they could issue Visa Black Cards.  At other times, Visa claimed that consumers were confused by the name "Visa Black Card," believing that Visa was the issuing bank, rather than the credit card network.  When Plaintiff informed Visa that it had received thousands of calls from banks and consumers, and had never received a call reflecting the sort of confusion Visa described, Visa was unmoved.  Despite repeated requests, Visa never offered any proof of the bank or consumer confusion that it alleged.  Instead, Visa continued to deny approval for Plaintiff's advertisements for a few days or weeks, only to change its mind and let plaintiff mail the allegedly problematic materials.

112.    Throughout these discussions, Visa personnel repeatedly informed Plaintiff that the decisions about the Black Card were "coming from the top."  Plaintiff understood this to mean that Scharf himself was directing them.

113.    These periodic interruptions in Plaintiff's advertising campaign inhibited Plaintiff's ability to increase customer awareness of its product.

### b.    Limitations on the Content of Plaintiff's Advertisements

114.    Visa, in collaboration with JPMorgan, used its contractual power over Plaintiff to alter the content (as well as the timing) of Plaintiff's advertisements.  More specifically, in the spring of 2014, Visa used its power to review Plaintiff's advertisements to pressure Plaintiff into removing a chart from its advertising materials that compared the benefits of using the Black Card and the Citi Prestige Card.  On March 14, 2014, while Plaintiff was urging Visa to approve its advertising materials, Scott Blum (Plaintiff's CEO) reminded Visa of a phone call in which Visa told Plaintiff that "Citi was not happy" about a chart in Plaintiff's advertisements comparing the Black Card to other products, including the Citi Prestige Card.  In light of that phone call, Mr. Blum wrote, "we will remove Citi from the comparison chart going forward."  Visa never responded to Mr. Blum to correct his understanding that it would be a good idea to

29

remove Citibank's card from the chart (because Citibank's card did not compare favorably to the Black Card).   If Visa were truly interested in promoting Plaintiff's product, it would have welcomed advertisements like this.

115.    On May 13, 2014, while Visa was again holding up Plaintiff's advertising campaigns, Mr. Blum reminded Visa of the "change we recently made . . . [as a] result of being told directly by Visa that it was unhappy with the reference to Citibank in our comparison chart. . . . [We] removed [the chart] from all of our marketing materials including direct mail, internet and print."  Once again, Visa never responded to Mr. Blum to correct his understanding that Visa wanted him to remove Citibank's card from the chart.

116.    Thus, Visa used its power over Plaintiff to stop Plaintiff from publicizing the ways in which its product was superior to a product offered by a competitor.   Without that information, some consumers made an uninformed choice to use the Citi Prestige Card instead of the Black Card.  While this did not immediately advantage Visa and JPMorgan, it did make it more difficult for Plaintiff to gain traction in the affluent credit card market and, over the long run, may have helped the conspirators nudge Plaintiff out of the market altogether.

### c.    Suppressing Plaintiff's New Products

117.    Perhaps most importantly, throughout 2014, Visa took steps to slow the release of two new credit cards that Plaintiff had designed for different segments of the affluent credit card market: the Gold Card and the Titanium Card.

118.    Plaintiff revealed the Titanium Card and the Gold Card to Barclays executives at meetings in Jackson, Wyoming in January 2014.

119.    Between January and September 2014, Visa refused to approve materials announcing that: (a) Plaintiff was rebranding itself as Luxury Card; and (b) consumers would

30

soon be able to purchase the Titanium Card and the Gold Card.  And without these materials, Plaintiff could not launch its new products.

120.    Plaintiff was perplexed by Visa's stance on the new marketing materials because those materials were modeled on—and nearly identical to—advertisements that Visa had approved for the Black Card.  Despite the similarities between the new and old materials, Visa claimed that they could not approve the advertisements announcing Plaintiff's new products because the advertisements were inconsistent with Visa's recently revised Product Brand Standards.  Among other changes, the revisions to the Product Brand Standards prohibited product names beginning with the word "Visa." What Visa neglected to tell Plaintiff was that the revisions were calculated to prevent Plaintiff from carrying out the marketing campaign for the Titanium Card and Gold Card.   Visa never actually implemented the revised brand standards, and therefore Plaintiff was the *only* entity affected by the supposed new prohibition against names beginning with Visa.  Visa simply used the threat of new standards to interfere with Plaintiff's marketing campaign.

121.    Moreover, the new standards did not further any legitimate purpose.  The only effect was to force Plaintiff to abandon the names "Visa Black Card," "Visa Titanium Card," and "Visa Gold Card," in favor of more cumbersome alternatives.  Visa suggested, for example, that Plaintiff could comply with its standards by naming its cards the "Luxury Card Black Visa," the "Luxury Card Titanium Visa," and the "Luxury Card Gold Visa."  These names did not in any way clarify Plaintiff's relationship with Visa; they merely made Plaintiff's products more difficult to pronounce and made it more difficult for potential customers to understand that Plaintiff was the company that had been providing "the Visa Black Card" to customers for the past five years.

31

122.    Visa knew that Plaintiff would not accept pointless name changes that prevented Plaintiff from capitalizing on the "Visa Black Card" brand that Plaintiff had so carefully built. But Visa's goal was never to get Plaintiff to accept the name changes; instead, the goal was to tie Plaintiff up in negotiations for several months to delay the release of two new products that would have increased competition in the affluent credit card market (the Titanium Card and the Gold Card).

123.    Visa's plan was successful:  After nine months of failed negotiations with Visa, Plaintiff finally realized that Visa was not working in good faith to reach a compromise.  As a result, Plaintiff decided to move the Black Card and its two new cards to the MasterCard network.  But the failed negotiations with Visa delayed Plaintiff's planned unveiling of its new products by nearly two years.  Plaintiff initially planned to launch its new cards in June 2014. But it pushed the launch date back one month at a time for each month it was in negotiations with Visa.  And when plaintiff realized that its relationship with Visa was beyond repair, it had to negotiate a partnership agreement with MasterCard, and then redesign its planned advertisements for the new cards with MasterCard branding.  Thus, rather than releasing the cards in June 2014, Plaintiff released them in January 2016.

124.    During this delay, JPMorgan was able to market its own affluent credit card to individuals who otherwise would have chosen Plaintiff's Titanium Card or Gold Card.

**6.    Additional Evidence of a Conspiracy**

125.    Two more events corroborate the existence of the Defendants' conspiracy.  First, on May 6, 2014, Visa told Plaintiff's executives, including Senior Vice President Ed Schumacher, that Visa and banking customers were not going to allow a small, independent company like Plaintiff into the affluent credit card market ever again. The strong implication from these comments was that Visa and its collaborators were united in the goal of preventing

Plaintiff, and other companies that would not go along with Visa's way of doing business, from participating in the affluent credit card market.

126.     Second, at a meeting on March 18, 2014, Visa executive James Lim made several illuminating statements to Plaintiff's Executive Team.  First, while the meeting was organized to discuss a possible initiative to bring the Visa Black Card to Asia, Mr. Lim told Plaintiff's CEO that Visa's strategy was actually to compete with Plaintiff both domestically and internationally. It is not clear why a Visa executive would say that to Plaintiff—its supposed co-brand partner— unless Visa were engaged in a conspiracy to promote a competitor's business.

127.     In addition, Mr. Lim showed Plaintiff a prototype of Plaintiff's new metal Black Cards, which Plaintiff had given Visa in mid-2013 to ensure that the metal card was compatible with the Visa payment network.  The prototype was supposed to be used by Visa product testers alone, but apparently Visa shared the prototype with Mr. Lim—who was involved in product development—so that Visa could develop a card that incorporated the best features of Plaintiff's product.  It is not clear why Visa would have asked its product development team to try to build a card that like Plaintiff's unless Visa was involved in a conspiracy to help one of Plaintiff's competitors.

### 7.     The Aftermath

128.     Shortly after the Defendants forced Plaintiff off the Visa network, the Defendants' conspiracy began to fall apart.  It appears that the anticompetitive conduct was discovered by those within Visa, JPMorgan, and Capital One, who recognized the conduct was illegal, and quickly moved to end it and cover it up.

129.     Upon information and belief, in October 2016, after Visa's board of directors learned of the conspiracy against Plaintiff, it forced its CEO—Charles Scharf—to resign.  Mr. Scharf resigned quickly and quietly, claiming that he needed to spend time with family.   Alfred

F. Kelly, a former American Express executive and a Visa board member, was appointed to replace Mr. Scharf.  Appointing a board member to replace someone in Mr. Scharf's position is a highly unusual move, typically reserved only for the direst of emergencies.

130.    In December 2016, JPMorgan announced that its profits for the year would be $200 to $300 million less than JPMorgan had expected.  JPMorgan publicly claimed that it lost this money by offering overly generous rewards to individuals who signed up for the new Chase Sapphire Reserve card.

131.    At the same time, a Capital One executive told Plaintiff that Visa had forced Capital One to take a $150 million loss.  From this remark, Plaintiff inferred that Capital One had to take the write-down to cover the costs of unwinding and covering up its conspiracy with Visa.  Realizing perhaps that he had revealed too much, the Capital One executive tried to backtrack, and said that Visa had taken $150 million in marketing from Capital One and reallocated it to Costco, an explanation that made no sense.

132.    In December 2017, Jim McCarthy—who helped negotiate the Promotional Agreement with Plaintiff—was fired.   Visa circulated a letter to staff saying that Mr. McCarthy had been fired for engaging in "behavior . . . that runs counter to [Visa's] leadership principles and culture."   Such a resignation is consistent with Mr. McCarthy's participation in an illegal conspiracy with JPMorgan and being forced out of the organization once it realized its risk of liability.

## D.    HARM TO BLACK CARD

133.    The Defendants' conduct harmed Plaintiff in a number of significant ways.  First, it limited Plaintiff's ability to send information about its products to potential customers, which limited the number of individuals who signed up for Black Cards.

34

134.    The Defendants' conduct also cost Plaintiff more than a year's worth of revenues that it would have received from the Titanium Card and the Gold Card if Plaintiff had been able to launch those products on time.

135.    Moreover, by forcing Plaintiff to switch credit card networks five years after it launched the Black Card, the Defendants prevented Plaintiff from receiving returns on the hundreds of millions of dollars it had invested in developing a "Visa Black Card," brand.  At the same time, the network switch forced Plaintiff to spend tens of millions of dollars manufacturing new cards and producing new advertisements for the MasterCard platform.  Finally, when Plaintiff switched to the MasterCard network, it lost ten percent of its customer base because consumers generally prefer the Visa network.

## E.    HARM TO COMPETITION

136.    The Defendants' agreements caused significant harm to competition in the affluent credit card market from 2008 to 2015.  As noted above, the Defendants' conduct prevented consumers from learning about all of the advantages that the Black Card had to offer, which limited Plaintiff's ability to compete for consumers' business.

137.    In addition, Defendants' agreements delayed entry of Plaintiff's Titanium Card and Gold Card, keeping them out of the market until January 2016.

138.    Because JPMorgan did not have to compete with Plaintiff on even footing, it made no meaningful effort to improve the quality or price of its affluent credit cards from 2013 to 2015.  At least one article suggested that the Chase Sapphire Preferred card cut some benefits and replaced them with worse benefits in 2014. [13]

---

[13]    *No More 7% Dividend on Points, but Primary Rental Coverage With Chase Sapphire Preferred*, MILLION MILE SECRETS (July 20, 2014), https://millionmilesecrets.com/2014/07/20/7-dividend-sapphire-preferred/.

2307696.1

139.     By contrast, in 2016, when MasterCard launched Plaintiff's Black Card, Titanium Card, and Gold Card, the affluent credit card market quickly became fiercely competitive. JPMorgan unveiled a new affluent card—the Chase Sapphire Reserve—which offered such an impressive set of benefits that customers flocked to sign up, and JPMorgan briefly ran out of cards. [14]

140.     These consumer benefits were necessary to compete with Plaintiff's now-unencumbered Luxury Card products.  With Plaintiff's move to the MasterCard network, and the demise of Defendants' conspiracy, JPMorgan was left with no choice but to compete with Plaintiff on the merits of its products.  It would have taken these or other competitive steps sooner if it had not forged agreements with Visa and Capital One to suppress competition from Plaintiff.

## F.     THE RELEVANT MARKETS

### 1.     The Relevant Product Market

141.     The relevant product market is the market for affluent credit cards: credit cards designed for individuals with exceptionally good credit scores, most of whom earn $100,000 per year or more.

### 2.     The Relevant Geographic Market

142.     The relevant geographic market comprises the all fifty states in the United States and all of the United States' districts and territories.

## G.     THE DEFENDANTS' MARKET POWER

143.     All of the Defendants have significant power in the market for affluent credit cards.

---

[14]   Ben Steverman, *Cult of Chase Sapphire: Credit-Card Churners Have a New Love*, BLOOMBERG (Sept. 2, 2016), https://www.bloomberg.com/news/articles/2016-09-02/chase-sapphire-reserve-deal-seeking-obsessives-have-a-new-favorite-credit-card.

36

144.     Visa has particularly strong market power.  As noted above, Visa owns the world's largest credit card processing network, processing more than $7 trillion in credit card transactions in each year.  In addition, more merchants accept Visa cards than any other type of card worldwide.

145.     Because more merchants accept Visa, more affluent consumers use Visa cards. According to a Mercator Advisory Group report, 38 to 39 percent of individuals with $200,000 or more in household income use Visa cards, with other networks lagging behind.

146.     Plaintiff's willingness to sign an exclusive marketing agreement with Visa is evidence of Visa's power in the affluent credit card market: Plaintiff was willing to sign an agreement that would make it very costly for it to switch to another credit card payment network because Visa cards are the most widely accepted credit cards in the world.

147.     In addition, JPMorgan is one of the five issuing banks with the greatest market share in the affluent credit card market.

148.     Finally, Capital One is one of the five issuing banks with the greatest market share in the general credit card market.

## VI.    CAUSES OF ACTION

### COUNT ONE
**Sherman Act, Section 1 15 U.S.C. §1 (Agreement in Restraint of Trade)**

149.     From 2007 to 2014, JPMorgan had an agreement with Visa to push Plaintiff out of the affluent credit card market. In 2013, Capital One joined in that agreement, and accepted a large sum of money from Visa in exchange for agreeing to forgo its planned partnership with Plaintiff.

150.     The Defendants' agreement bogged Plaintiff down in costly and protracted litigation; cost Plaintiff thousands of customers that would have signed up for a Black Card if

37

Plaintiff could have run a fully effective advertising campaign for the Black Card; cost Plaintiff thousands of customers that would have signed up for a Titanium Card or Gold Card if those cards had been available—as planned—in the summer of 2014; deprived Plaintiff of the return on the $100 million investment plaintiff made in developing the "Visa Black Card" brand; and required plaintiff to spend tens of millions of dollars developing new cards and advertising materials with the "MasterCard" name.

151.    Moreover, the banking Defendants' agreements with Visa limited Plaintiff's ability to share information about its products with consumers and kept two of Plaintiff's products out of the affluent credit card market for nearly two years, rendering the market less competitive.  As a result of the lack of competition, consumer benefits were reduced and the effective price to consumers for high-end credit cards was maintained above the competitive price.

152.    Because the Defendants' agreements reduced the number of choices available to participants in the affluent credit card market, the agreements are *per se* unreasonable restrains on trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Alternatively, the agreements are inconsistent with Section 1's rule of reason.

153.    As a result of these violations of Section 1 of the Sherman Act, Plaintiff has been injured in its business and property in an amount not presently known.

<u>**COUNT TWO**</u>
**Fraudulent Concealment and Equitable Tolling**

154.    Plaintiff, through the exercise of reasonable diligence, could not have discovered Defendants' wrongful conduct—or the injuries it caused—any sooner because Defendants' fraudulently concealed their conduct and its impact on Plaintiff's business.

155.    For the Defendants' conspiracy to succeed, they had to trick Plaintiff into believing that it had a genuine business partnership with Visa, and genuine prospective partnerships with JPMorgan and Capital One. Visa therefore represented to Plaintiff that it wanted Plaintiff's business to be a success. JPMorgan and Capital One, at various times, pretended to be either contemplating a mutually beneficial partnership with Plaintiff or competing with Plaintiff on the merits.

156.    Plaintiff had no reason to suspect that Visa was seeking to undermine its business until Visa offered suspicious explanations for its refusal to approve Plaintiff's advertising materials in 2014 and the events that followed.

157.    Plaintiff had no reason, at the time, to suspect that JPMorgan or Capital One had not been acting independently when they withdrew from their respective prospective partnerships with Plaintiff.

158.    After the sudden resignation of Visa's CEO and the reported losses by JPMorgan and Capital One, Plaintiff began to suspect that the harmful conduct of each of these three entities against it was connected.  At that point, Plaintiff began a diligent investigation into Visa's and the others' conduct and the possible motives for Visa's and the others' conduct.

159.    Plaintiff's investigation revealed that the Defendants had been engaged in a conspiracy to push Plaintiff out of the affluent credit card market since 2007.

## VII.    PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that final judgment be entered against each Defendant granting the following relief:

A.    An award of treble damages to the plaintiff, based on the unlawful conduct of Defendants,

B.    An award of post-judgment interest and any other interest permitted by law,

39

2307696.1

C.      An award of the costs of this suit, including reasonable attorneys' fees, as provided by law, and

D.      Such other relief as the Court determines just and proper.

## VIII.   **JURY DEMAND**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable as of right by a jury.


Dated:  December 28, 2017                    **COHEN MILSTEIN SELLERS & TOLL PLLC**

                                             */s/ Laura Alexander*

                                             Laura Alexander
                                             Alison Deich
                                             1100 New York Ave. NW, Suite 500
                                             Washington, DC 20005
                                             Telephone: (202) 408-4600
                                             Fax: (202) 408-4699
                                             lalexander@cohenmilstein.com
                                             adeich@cohenmilstein.com

                                             *Attorneys for Plaintiff Black Card LLC d/b/a/ Luxury Card*

2307696.1